IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ENCYCLOPAEDIA BRITANNICA, INC., <br><br> Plaintiff, <br><br> vs. <br><br> STUDENT NEWS NET, a division of NINTH WAVE MEDIA, LLC, <br><br> Defendant. | Case No. |

**COMPLAINT**

Plaintiff Encyclopaedia Britannica, Inc. ("EB"), by and through its counsel, Lathrop & Gage LLP, respectfully files its Complaint against defendant Student News Net, a division of Ninth Wave Media, LLC ("SNN"), for: (1) breach of contract related to early termination without cause, (2) declaratory judgment that SNN's claims (if any) are issues of contract law (not copyright law), (3) declaratory judgment that SNN's contract claims are moot, (4) declaratory judgment that SNN cannot satisfy the elements of copyright infringement, and (5) declaratory judgment that EB has valid defenses to any claim of copyright infringement. In support of its Complaint, EB states as follows:

**INTRODUCTION**

1. EB has been in business for more than two centuries and is a well-respected publisher of hard copy and digital educational materials.

2. SNN operates StudentNewsNet.com, a subscription Web site that offers current events and curricular content directed at students.

3. SNN's content is often based on news wire stories that are slightly revised for a student audience.

1

4. In 2005, SNN and EB entered into a business relationship with the twin goals of driving more subscribers to SNN's StudentNewsNet.com Web site through the use of EB's well-known and respected brand name and providing accessible news content for EB's younger readers.

5. Unfortunately, SNN's subsequent financial struggles led it to employ deception to breach its agreement with EB, terminate access by EB subscribers to SNN content, and begin pursuing EB-referred subscribers individually.

6. Additionally, apparently hoping for a windfall (and intent on obscuring its own bad acts), SNN now has conjured up claims related to alleged contractual breaches and alleged copyright infringements by EB that have no merit and were never raised during the seven-year relationship between EB and SNN.

7. EB brings this action to hold SNN responsible for its conduct and obtain declaratory relief as to SNN's ill-founded claims.

**JURISDICTION AND VENUE**

8. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1338(a).

9. EB is a Delaware corporation with its principal place of business in Chicago, Illinois.

10. Upon information and belief, SNN is an Ohio limited liability company with its principal place of business in Toledo, Ohio.

11. The amount in controversy exceeds $75,000.

12. The Court has personal jurisdiction in this matter because EB and SNN do business in this District.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events and omissions giving rise to the claims occurred in this District.

2

## FACTUAL BACKGROUND

### Reciprocal Content License Agreement between EB and SNN

14. On February 22, 2005, EB and SNN entered into a Reciprocal Content License Agreement (the "Agreement"). (Attached hereto as **Exhibit A**).

15. The Agreement provided SNN a nonexclusive license to display certain EB content on StudentNewsNet.com, subject to certain conditions established in the Agreement.

16. The Agreement also provided EB a nonexclusive license to link to certain SNN content through EB Web properties known as BE Online and CB Online, subject to certain conditions established in the Agreement.

17. The Agreement provided for linking of the SNN content via EB by means of RSS protocol.

18. RSS protocol (short for "really simple syndication") is a Web feed format used to enable access to frequently updated works in a standardized format.

19. The Agreement did not provide for any licensing fees and contained no consideration other than the reciprocal licensing of content.

20. The Agreement provided for termination under the following circumstances:

> A. If either Party should breach any material provision in this Agreement and fail to remedy such default within thirty (30) days after receipt of written notice from the other, this Agreement shall terminate effective as of the expiration of said thirty (30) day period.
>
> B. If either Party ceases operations in the normal course of business or seeks to make a compromise, assignment, or other arrangement for the benefit of creditors, then the other Party may terminate this Agreement by written notice of termination with immediate effect. Either Party may similarly terminate this Agreement if the other becomes a party to bankruptcy, receivership, or similar proceedings affecting its financial condition, unless such proceedings are discharged within sixty (60) days.

Exhibit A, at Terms and Conditions, ¶ 11.

21. The Agreement restricted the forms of notice as follows:

> All notices or other communication given under this Agreement shall be in writing and shall be sent by certified mail or overnight delivery service to the Party for whom it is intended at such Party's address shown above its signature to this Agreement, marked "Attn: Legal Department." Such notices shall be considered given three days after the date mailed, or upon receipt if sent by overnight delivery service.

Exhibit A, at Terms and Conditions, ¶ 13.

22. The Agreement was to expire by its own terms on February 22, 2008. Exhibit A, Para. IV.

### 2008 Amendment establishes additional terms.

23. On November 10, 2008, EB and SNN executed an amendment to the Agreement (the "2008 Amendment") (Attached hereto as **Exhibit B**).

24. The 2008 Amendment amended the license to EB to establish an exclusive linking license to "Premium SNN Content."

25. The "Premium SNN Content" is defined as

> [T]he SNN Service, cobranded per the terms of this Agreement, and including, in additional [sic] to a section of current events articles, a section entitled "Today in History by Britannica" and the Word of the Day, and the following tabbed sections: Science, City Civics, Photo Library, Our World, My Enotes, and Interactives. A copy of the home page is attached as Schedule 2. SNN shall not substantially decrease the breadth or depth of the SNN Service without prior written approval of EB. EB shall charge its Subscribers for access to the SNN Premium Content at a price to be determined by EB in its sole discretion.

Exhibit B, at ¶ F.

26. The 2008 Amendment also stated:

> Premium SNN Content shall be accessed by Users whose institutions are Premium SNN Content subscribers through the link described in Paragraph B-2 of this Section II. All Users of the EB Service shall be able to see the home page of the SNN Service via this link. Users whose institutions have subscribed to the Premium SNN Content will be authenticated via EB's IPP systems and will be able to seamlessly view Premium SNN Content beyond the home page. Users who do not have subscriptions to the Premium SNN Content will be able to click back to the SNN Service home page, and click back again to the SNN Article on the EB Services, without interruption.

Exhibit B, at ¶ B.

4

27. The 2008 Amendment also established a license fee for the Premium SNN Content as follows:

> After deducting costs of sales equal to thirty percent (30%) of Revenues, EB shall pay SNN license fees ("the License Fees") for each EB Subscriber who purchases a subscription to the Premium SNN Content in an amount equal to fifty percent (50%) of remaining Revenues (35% of total Revenues) per subscriber to Premium SNN Content per calendar quarter. EB shall pay SNN the License Fees not later than thirty (30) days after the end of each calendar quarter in the Term, except, however, for the first quarter, during which EB shall pay SNN any License Fees monthly. For purposes of this Agreement, "Revenues" shall mean net subscription fees collected by EB to access to [sic] the Premium SNN Content, less adjustments made for cancellations and refunds, if any.

Exhibit B, at Schedule A.

28. The 2008 Amendment also stated:

> Notwithstanding the foregoing, EB reserves the right, in its sole discretion, to provide reasonable amounts of free and/or discounted access ("Trial Offers") to the Premium SNN Content to new or existing Subscribers of the EB Services for marketing, promotional or other related purposes. Trial Offers shall not generate any payment or other compensation for SNN. The terms of any Trial Offer shall be consistent with similar trial offers provided by or offered by EB for its own products. However, in no event shall any Trial Offer extend past the termination of this Agreement.

Exhibit B, at Schedule A.

29. The 2008 Amendment extended the term of the Agreement to February 22, 2011. Exhibit B, at ¶ D.

30. The 2008 Amendment did not modify the terms under which either party could terminate or provide notice under the Agreement.

### 2011 Amendment establishes further additional terms.

31. On May 20, 2011, EB and SNN executed a second amendment to the Agreement (the "2011 Amendment") (Attached hereto as **Exhibit C**).

32. The 2011 Amendment extended the term of the Agreement through February 22, 2014. Exhibit C, at ¶ II.

33. The 2011 Amendment also limited trial offers of Premium SNN Content, such that "[a]ny school provided with access to SNN for the entire school year will pay for the service." Exhibit C, at ¶ III.

34. The 2011 Amendment also modified the license fees to add the following language:

Rates:

1. For SNN sales obtained exclusively through the efforts of SNN (those efforts are defined as relationships or contacts not previously owned by EB), SNN shall receive compensation of 50% of the gross revenue before any deductions.

2. Along with quarterly royalty reports, a list of schools and districts subscribed will be included by EB.

3. Revenue split between EB and SNN from corporate sponsorships obtained through the efforts of SNN will be negotiated on a case-by-case basis.

Exh. C, at ¶ 11.

35. The 2011 Amendment did not modify the terms under which either party could terminate or provide notice under the Agreement.

### SNN implements the RSS feed.

36. Consistent with the Agreement, SNN enabled the RSS feed from SNN to the BE Online and CE Online Web sites, thereby driving traffic to StudentNewsNet.com when BE Online or CE Online users followed the links. These sites are sold to schools and are used by teachers and students.

37. The RSS feed also was available on EB's 21st Century Explorers site, which is merely a combination of BE Online and CE Online. 21st Century Explorers was created at the request of teachers who liked using BE Online (designed for grades K-5) and CE Online (designed for grades 6-8) but did not want to stigmatize remedial readers who needed to go to a separate site from their peers.

6

38. In exchange for the RSS feed content, SNN received content from EB to display on its homepage template under the headings of "Word of the Day" and "Today in History by Britannica." *See* sample SNN home page, Exh. B, Schedule B.

39. As early as 2008, SNN's founder, Judy Miller, met with EB personnel in Chicago and requested that the RSS feed be included on EB's consumer-facing site in an effort to drive additional traffic and potential subscribers to StudentNewsNet.com. EB agreed to do so.

40. The code for the RSS feed was designed to link EB site visitors to content on SNN servers. The original text was a headline and/or short blurb that, if clicked on by an end-user, would direct the user to the text of the SNN story hosted on SNN servers. That text appeared on the same graphical user interface as the EB page, but was prominently marked as being SNN's content. The user was then given the opportunity to click on a link to StudentNewsNet.com.

41. The SNN headlines, blurbs, and news stories were never stored or archived on servers belonging to EB. Rather, the content always remained in the sole possession of SNN and was simply available by link from the EB sites via the RSS feed created and managed by SNN.

42. If SNN believed that EB or its users were misusing or misappropriating the RSS feed content, it always had the ability to cut off access. SNN never did.

43. In fact, it appears that SNN continues to enable its RSS feed to EB's sites to this day.

**EB implements the Premium SNN Content.**

44. Consistent with the terms of the 2008 Amendment, EB's sales staff began marketing and selling the Premium SNN Content to institutions nationwide.

45. When an institution purchased the Premium SNN Content, that institution would receive a user name and password or be provided access via one of EB's other standard authentication methods, including IP recognition or referring URL, which would allow

7

individuals at that institution to access the Premium SNN Content through a portal provided by EB.

46. As set forth in the 2008 Amendment, EB's servers authenticated the user's access credentials and then connected the user via Web link to the Premium SNN Content beyond SNN's home page.

47. To the extent that the Premium SNN Content appeared on the same graphical user interface as EB's Web pages, this was merely the result of linking. The Premium SNN Content was never stored or archived on EB's servers; the content always remained in the sole possession of SNN.

48. Pages on EB's Web site promoting SNN noted that subscribers would be able to access more than 4,500 archived stories, but this was not an indication that these stories were archived by EB. Rather, this was a promotion describing the content archived by SNN on its servers.

49. Upon information and belief, SNN has the ability to log the number of page views to the Premium SNN Content and the location of those end users.

50. From time to time during the relationship between SNN and EB, SNN would alert EB to Web activity that it believed was inconsistent with the known universe of paying subscribers. In each such instance, EB attempted to address the issue right away.

51. An unfortunate reality is that end-users sometimes provide their log-in credentials to others, which could result in traffic from individuals who have not subscribed.

52. Additionally, EB sales staff members often used their log-in credentials during presentations at institutions nationwide, which sometimes resulted in page views from unusual areas.

53. Finally, pursuant to the terms of the Agreement, EB provided institutions with free trials to the Premium SNN Content. This practice was well-known to Miller and she expressly encouraged EB to offer *more* free trials.

54. The terms of these free trials also were addressed in the 2011 Amendment. *See* Exhibit C, at ¶ III.

55. To the extent these factors led to unusual traffic on SNN's Web site, they were beyond EB's control, were consistent with the terms of the Agreement, and/or represented efforts to *promote* SNN. The traffic certainly is not evidence that EB has sold subscriptions to the Premium SNN Content without remitting license fees to SNN. In fact, EB did not derive any additional revenue from these uses of log-in credentials.

56. In communication with EB, SNN has acknowledged that although it tracks traffic to the SNN site, it has no way of determining whether that traffic came through a valid subscription, a free trial, or some other avenue.

**EB includes Premium SNN Content in bundled services
and undertakes other efforts to promote SNN.**

57. From the outset of the relationship, EB's sales staff struggled to find institutions interested in purchasing Premium SNN Content on an individual basis.

58. To remedy this problem and increase SNN's marketplace exposure, EB began to include access to Premium SNN Content in "bundles" with other educational content services. EB sold Premium SNN Content to its existing customers as upsells.

59. Miller was aware of, and approved, this approach.

60. When Premium SNN Content access was included in a bundle, SNN should have received its proportionate share of the revenue under the Agreement, but the EB sales team was accustomed to turning on access through EB's Britannica Online Access Tool system without listing the separate items in the bundle.

9

61. As a result, the bundled revenues may, on occasion, not have been attributed to SNN in a timely fashion. Whenever these issues were discovered during the course of the relationship with SNN, EB would remedy these issues as quickly as possible.

62. SNN has claimed that some portion of the revenues remain outstanding. EB has made an accounting and has offered to pay an amount that is equal to or greater than any amount owed (if anything is owed at all). However, SNN has disputed that figure and has refused to accept payment.

63. EB's conduct throughout the relationship with SNN demonstrates that EB has acted in good faith to promote and support SNN.

64. The bundling strategy resulted in significantly greater exposure and revenues for SNN than would have been possible selling Premium SNN Content as a single product, and the RSS feeds to EB's consumer-facing page gave SNN additional free exposure to EB's customers (the RSS feed generated no income for EB).

65. Moreover, through the original reciprocal agreement, EB lent its name, trademarks, goodwill, and content to a fledgling company that EB believed could provide a valuable service to institutions nationwide.

66. Also, EB's prominence in the industry helped earn SNN nominations and awards, for which Miller expressed gratitude and excitement during the course of the relationship.

67. EB also advanced as much as $6,500.00 at a time to SNN on multiple occasions to ensure that SNN could continue operations.

68. In short, EB went above and beyond what was required in the Agreement to help SNN succeed.

**SNN allegedly faces financial difficulties and attempts to prematurely terminate the Agreement without cause.**

69. On July 5, 2012, Miller contacted EB Vice President Michael Ross and informed him that SNN would be ceasing operations effective August 1, 2012 because SNN was losing hundreds of thousands of dollars each year.

70. Miller stated that she would cease production in an orderly fashion and continue to operate the site until its last day on August 1, 2012.

71. Miller's communication failed to comply with the termination and notice provisions of the Agreement in that there were no claims of breach for cause or imminent EB bankruptcy, nor was notice sent to EB's legal department.

72. However, given Miller's representations regarding SNN ceasing operations, Ross did not at that time demand strict compliance with the termination and notice provisions of the contract because he believed that SNN soon would be out of business.

73. Noting that many schools relied on the Premium SNN Content as part of their curriculum and that two large contracts for Premium SNN Content had just been signed, Ross requested that SNN continue its obligations under the Agreement until the end of September.

74. Miller agreed to an effective termination date of August 1, 2012, with a 60-day close-down period through September 30, 2012.

75. But contrary to Miller's statements to Ross, SNN has not ceased operations.

76. Despite Miller's claim that SNN is losing hundreds of thousands of dollars each year, SNN continues to operate its Web site in the same form as before — including sections for "Word of the Day" and "Today in History."

77. Miller's statements did not accurately represent the financial position of SNN and/or her intent with respect to whether to continue operation of SNN. Rather, the statements were a subterfuge designed to obtain EB's consent to terminate SNN's obligations under the

contract prematurely and collect higher revenues through direct relationships with customers referred by EB to SNN.

78. SNN has since approached current and former EB customers — whose information was provided by EB to SNN under the Agreement — and attempted to enter into direct relationships with them (rather than sharing revenues with EB under the Agreement).

79. At least one customer (one of the Area Education Agencies in Iowa) that previously subscribed to the Premium SNN Content through EB has now subscribed directly with SNN. It was in talking to the state coordinator who oversees nine Area Education Agencies in Iowa that EB first learned that SNN was continuing to provide content.

**EB complies with its obligations following SNN's breach.**

80. Following SNN's premature termination of the contract, EB began the process of notifying its customers that the Premium SNN Content would no longer be available.

81. In the meantime, SNN posted a notice on its Web site indicating that customers' "access to SNN through your Encyclopaedia Britannica login will expire" and directing customers to contact SNN directly for more information. As a consequence, many EB customers learned of SNN's termination for the first time when they logged in, and those customers contacted SNN rather than EB to resolve the issue.

82. Because of SNN's early termination of the contract, without cause, EB was forced to provided credits for subscription fees to several customers.

83. Pursuant to the 2008 Amendment, these amounts could be deducted from any amounts owed to SNN. *See* Exhibit B, at Schedule A.

84. SNN's early termination has cost EB not only revenue from subscription fees, but also customer goodwill.

85. EB removed the RSS feed links from its sites by deleting the homepage links and navigational elements leading to SNN content.

86. No SNN content exists (or has ever existed) on EB's Web servers, but it appears that SNN has not deleted the RSS links from *its* servers. Accordingly, if a user bookmarked or retained a link to SNN content, that user may still be able to access the content through means beyond EB's control.

87. Although older versions of EB's Web pages that can be found through Google, the WayBackMachine, or other Internet archiving services may appear to contain SNN content, those pages are no longer active or accessible through EB's home pages, and the EB pages are only able to render the content because SNN has not disabled the RSS feeds on its servers or secured the data.

88. SNN has the ability to "change the locks" on its site, but has failed to do so. EB's expectation, based on communications from SNN, was that SNN was planning to deactivate its entire site, including the RSS feeds. If carried out by SNN, this would have caused any such bookmarked or archived site links to return an error rather than content.

89. EB later learned that rather than shut down its site, SNN actually intended to continue operations.

90. At that point, the damage related to SNN's feigning its demise already had been done.

**SNN threatens legal action against EB.**

91. Despite the efforts undertaken by EB to bolster SNN's reputation and revenues, SNN has threatened to sue EB.

92. On November 6, 2012, SNN's counsel sent a letter to EB, alleging that EB breached the Agreement, misappropriated SNN's intellectual property, infringed upon SNN's copyrights, and tortiously interfered with SNN's prospective business opportunities.

93. SNN claims that EB intentionally failed to pay SNN for a substantial number of subscriptions, linked to the RSS feed on sites other than those authorized by SNN, used SNN's

13

content on EB's sites without authorization (and continues to do so), and improperly held itself out as SNN's "owner." None of this is accurate.

94. Following discussions with EB, SNN's counsel followed up with another demand letter on November 13, 2012, arguing that SNN was entitled to damages of $5,528,250.00 — an astonishing figure when considering that the total gross revenue for Premium SNN Content over the life of the Agreement is only slightly more than $100,000.00.

95. After further discussions between the parties, EB made its formal response on December 21, 2012, offering an amount that was equal to or greater than any amount potentially owed to SNN to resolve the revenue attribution issues.

96. Unwilling to listen to reason, SNN's counsel sent a third demand letter on January 23, 2013, now arguing that SNN was entitled to more than $10,000,000.00 and stating that SNN would take legal action by January 31, 2013.

97. Seeing that further discussion would be fruitless, EB ceased communications with SNN's counsel and has filed the instant lawsuit.

**Count I – Breach of the Contract (premature/improper termination)**

98. EB incorporates Paragraphs 1 through 97 by reference as if fully set forth herein.

99. Under the Terms and Conditions of the Agreement, SNN could terminate the contract only if (1) EB breached a material provision of the Agreement, or (2) either party ceased operation or sought to make a compromise, assignment, or other arrangement for the benefit of creditors. *See* Exhibit A, Terms and Conditions, at ¶ 11.

100. Under the Terms and Conditions of the Agreement, SNN could only provide notice of termination by writing sent by certified mail or overnight delivery, to the attention of the EB legal department. *See* Exh. A, Terms and Conditions, at ¶ 11.

101. Neither EB nor SNN has ceased operations or been involved in an arrangement for the benefit of creditors.

102. In the emails and other communications from Miller, SNN made no reference to any material breaches by EB.

103. Rather, SNN claimed it needed to terminate the contract because it was going out of business (which was both untrue and not a contractual basis for termination).

104. Moreover, the emails and other communications from Miller were inadequate to provide notice under the Agreement.

105. In ending its relationship with SNN, EB relied on Miller's misrepresentations regarding the financial wherewithal of SNN and its intent to shut down. Thus, EB has not waived its rights under the termination and notice provisions.

106. As a result of SNN's attempt at premature and improper termination, EB has suffered damages in the form of lost revenues and lost customer goodwill in an amount to be determined at trial.

WHEREFORE, EB prays for compensatory damages, attorneys' fees, costs, and prejudgment interest against SNN for its breach of the Agreement, and for such other relief as the Court deems just and proper.

**Count II – Declaratory Judgment (SNN's claims are issues of contract law.)**

107. EB incorporates Paragraphs 1 through 106 by reference as if fully set forth herein.

108. SNN is incorrect in its assertion that SNN's claims sound in copyright. SNN merely claims that EB's alleged usage of SNN's content violates the covenants of the Agreement.

109. Because the alleged improper conduct (if true) would constitute a breach of an enforceable contractual obligation, SNN's cause of action is for breach of contract, not copyright infringement.

WHEREFORE, EB prays for a declaratory judgment that, to the extent EB's conduct gives rise to any cause of action, SNN's proper cause of action is a claim for breach of contract,

rather than a claim for copyright infringement, and for such other relief as the Court deems just and proper.

**Count III – Declaratory Judgment (SNN's contract claims related to past revenues for Premium SNN Content subscriptions are moot.)**

110. EB incorporates Paragraphs 1 through 109 by reference as if fully set forth herein.

111. EB has provided an accounting to SNN and offered to pay an amount equal to or greater than the amount allegedly owed (if any amount is owed at all).

112. Accordingly, SNN's claims with respect to these past revenues from Premium SNN Content subscriptions are moot, and SNN lacks standing to assert such claims.

WHEREFORE, EB prays for a declaratory judgment that SNN's breach of contract claims with respect to past revenues from Premium SNN Content subscriptions are mooted by EB's offer to pay the amounts due and SNN therefore lacks standing to assert such claims, and for such other relief as the Court deems just and proper.

**Count IV – Declaratory Judgment (SNN cannot satisfy the elements of copyright infringement.)**

113. EB incorporates Paragraphs 1 through 112 by reference as if fully set forth herein.

114. As set forth above, SNN's proper remedy for EB's alleged improper actions is a cause of action for breach of contract.

115. However, even if SNN could pursue a cause of action for copyright infringement, SNN is not capable of establishing the elements of a copyright infringement claim — particularly a claim for statutory damages.

116. As an initial matter, despite SNN's claim to the contrary, EB has been unable to locate a copyright registration for any of SNN's content. EB has searched the U.S. Copyright Office Web archive for any reference to Student News Net, SNN, StudentNewsNet.com, Ninth Wave Media, LLC, and Judy Miller (including logical variations) and has not located any registrations.

117. Without a valid registration for the content allegedly at issue, SNN cannot maintain a cause of action for statutory damages under the U.S. Copyright Act.

118. Moreover, the SNN content is not sufficiently original to merit copyright protection. SNN's content is more closely analogous to a factual compilation than a truly original creative work of authorship.

119. But even if SNN's content merits copyright protection, SNN cannot establish that EB actually used the content in any way implicating the rights set forth in the U.S. Copyright Act.

120. As set forth above, SNN's content has always resided exclusively on SNN servers and has never been stored or archived on EB's servers. The content at issue has always been in the exclusive possession and control of SNN, and SNN has always had the ability to terminate access to that content.

121. Accordingly, SNN cannot maintain a claim for copyright infringement.

WHEREFORE, EB prays for a declaratory judgment that SNN cannot establish the elements of a claim under the U.S. Copyright Act, and for such other relief as the Court deems just and proper.

### Count V – Declaratory Judgment (EB has valid defenses to any claim of copyright infringement.)

122. EB incorporates Paragraphs 1 through 121 by reference as if fully set forth herein.

123. As set forth above, SNN cannot establish the elements of a claim under the U.S. Copyright Act.

124. However, even if SNN could establish the fundamental elements of a copyright claim, EB has valid defenses to any such claim.

125. Any copyright claims by SNN against EB would be barred by the doctrine of express license because EB acted at all times within the scope of the Agreement.

126. Any copyright claims by SNN against EB also would be barred by the doctrine of implied license.

127. Any copyright claims by SNN against EB also would be barred by doctrines such as express and implied consent, waiver, estoppel, and acquiescence because of the representations and actions of SNN and its founder, Miller.

128. Any copyright claims by SNN against EB also would be barred by the doctrine of laches because SNN knew or should have known about some or all of the alleged improper acts by EB years ago, but took no action.

WHEREFORE, EB prays for a declaratory judgment that EB has valid defense to any claim by SNN under the U.S. Copyright Act, and for such other relief as the Court deems just and proper.

Dated:   January 30, 2013                LATHROP & GAGE LLP


By: /s/ Blaine C. Kimrey

Blaine C. Kimrey
bkimrey@lathropgage.com
Bryan K. Clark
bclark@lathropgage.com
155 N. Wacker Drive, Suite 3050
Chicago, IL 60606
T:  (312) 920-3300
F:  (312) 920-3301